UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

     v.                                   CASE NO. 8:21-cr-0294-MSS-AAS

TIMOTHY MILLS, II

## GOVERNMENT'S SENTENCING STATEMENT

COMES NOW, the United States of America, by and through United States Attorney Roger B. Handberg and Assistant United States Attorney Craig R. Gestring, and hereby submits the following statement with respect to sentencing factors. The government adopts the factual findings of the July 29, 2022, Revised Pre-sentence Investigation Report (see Doc. 34) with respect to sentencing factors.

## I.    THE SECTION 3553(a) FACTORS SUPPORT THE IMPOSITION OF A GUIDELINE SENTENCE OF IMPRISONMENT

In reviewing the Section 3553(a) factors, as enumerated in Title 18 of the United States Code, the government respectfully requests the Court particularly consider the need for the sentence to reflect the nature and circumstances of the offense, the seriousness of the offense, the need for deterrence, as well as to protect the public from further crimes (18 U.S.C. §§ 3553(a)(1) and (a)(2)).

### A.    Individualized Assessment

It is well settled that calculating the advisory sentencing guidelines is the first step in determining the defendant's ultimate sentence, after which the Court must consider the §3553(a) factors. An "individualized assessment" of the §3553(a) factors

as applied to this defendant supports the imposition of a guideline sentence of imprisonment as part of any sentence imposed by the Court.

This Court should consider the seriousness of the crime, the nature of the criminal conduct, and sentence the defendant to include a guideline sentence of imprisonment between 210 to 262 months.

**Background**

From at least July 2020 until at least September 16, 2020, in the Middle District of Florida, the defendant sold methamphetamine which he obtained from and sold with others, including J.D.

On July 22, 2020, Mills met an undercover agent in a gas station in the Middle District of Florida. Mills exited a vehicle and retrieved several baggies of methamphetamine, which Mills sold to the undercover agent. Specifically, Mills sold approximately 111 grams of 97-percent-pure methamphetamine to the agent for $2,800. Mills also sold the agent several pills that Mills purported were ecstasy, but which, in fact, contained a variety of substances, including methamphetamine, for $120. Mills brought the funds back to his vehicle where his codefendants verified the sufficiency of the funds.

On August 5, 2020, in a motel parking lot in the Middle District of Florida, Mills sold the agent approximately 109 grams of 97-percent-pure methamphetamine for $2,650. Mills again arrived in a vehicle with a male and a female codefendant.

On September 16, 2020, at a residence in the Middle District of Florida, Mills possessed and sold the undercover agent approximately 223.3 grams of 96-percent-

2

pure methamphetamine, approximately 2.3 grams of marijuana, an Arcadia Machine and Tool semi-automatic pistol, and six rounds of .22-caliber ammunition, for $5,300. The sales were video recorded.

Mills had been advertising on social media his desire to purchase firearms, including assault rifles, since at least May 2020. Prior to this purchase, Mills knew he had been convicted of felonies, including domestic battery by strangulation and felony battery (domestic), and that his right to possess firearms and ammunition had not been restored.

### A. <u>Methamphetamine is a dangerous Schedule II controlled substance</u>

Methamphetamine is an incredibly dangerous Schedule II controlled substance and its use, addiction, overdoses, and associated deaths have been surging in a new epidemic. There is substantial empirical data to emphasize the dangers of methamphetamine and to justify the Sentencing Guidelines.

In 1998, the Sentencing Commission issued a "Final Report" regarding the implementation of the *Methamphetamine Trafficking Penalty Enhancement Act of 1998*. In this report, the Sentencing Commission referenced data which emphasized the increased use and spread of methamphetamine across the country. See U.S.S.C., METHAMPHETAMINE: FINAL REPORT, (Nov. 1999). The report cited data from *The Drug Abuse Warning Network*, which reported "substantial increases in hospital emergency room" visits among Hispanics, women, and youth. Id. At 3. Additionally, it stated that in 1997, 5,786 meth labs were seized by the Drug Enforcement Agency. Id.

Further, modern data demonstrates that methamphetamine is an increasing public health concern. Methamphetamine overdose deaths tripled between 2015 and 2019. Methamphetamine-Involved Overdose Deaths Nearly Tripled Between 2015 to 2019, NIH Study Finds, NIH (Sept. 22, 2021). https://nida.nih.gov/news-events/news-releases/2021/09/methamphetamine-involved-overdose-deaths-nearly-tripled-between-2015-to-2019-nih-study-finds. Additionally, the National Institutes of Health's study revealed that from 2015 to 2019, the amount of people reporting "frequent" methamphetamine use (100 days or more per year) increased 66 percent. As methamphetamine becomes cross-contaminated with fentanyl, and "higher-risk" methamphetamine usage becomes more prevalent, fatal overdoses will continue to rise.

Other reports are calling this surge in methamphetamine overdoses the "Second Wave of the Methamphetamine Epidemic." Leigh Wedonoja, *The Second Wave of the Methamphetamine Epidemic*, ROCKEFELLER INST. OF GOV'T (July 28, 2020), https://rockinst.org/blog/the-second-wave-of-the-methamphetamine-epidemic/. Data from the CDC shows that while cocaine deaths have "leveled out," meth overdoses are continuing to rise. *Id*. Additionally, unlike opioids, there is no lifesaving overdose-blocking drug (i.e., Narcan) that can be used to save people from methamphetamine overdoses, seemingly making methamphetamine more lethal. *Id*. Methamphetamine use goes beyond addiction, as it can lead to full blown psychosis, cardiovascular disfunction, mental disorders, and for too many, death. *Id*.

Methamphetamine use has been a national health threat since the 1990s, and as data suggests, is becoming even more of a threat today. Methamphetamine is becoming "purer [and] more potent," and sadly, there is no overdose-reversing drug to save the lives of countless users. *Id*.

By enforcing the sentencing guidelines as they are, courts can help to counter this "second wave" of the methamphetamine epidemic by severely punishing those who would distribute large quantities of methamphetamine.

B. **The nature and seriousness of the offense**

For three decades, Congress has repeatedly emphasized its intent to punish methamphetamine more harshly while reducing punishments for other illegal narcotics. The Supreme Court has repeatedly looked to congressional intent when determining whether the Guidelines are reasonable. In *Booker*, the Supreme Court clarified the importance of seeking an "increased uniformity of sentencing that Congress intended its Guidelines system to achieve." 543 U.S. at 246.

Looking to Congress's intent has always been an important step in the final determination of whether to implement the Guidelines at sentencing. See *Moore v. United States*, 555 U.S. 1, 2 (2008) (quoting the district court's statement that "Congress is the one who looks at the guidelines and decides whether or not they should be put in–in force...it isn't the judges. It's the lawmakers....").

Over the last three decades, Congress has consistently increased penalties for methamphetamine distribution. See Amy Baron-Evans, *Promulgation and Amendment of U.S.S.G. § 2D1.1*, Methamphetamine Offenses 1988-2012. Beginning in 1988,

5

Congress passed the *Anti-Drug Abuse Act of 1988*, which established a mandatory minimum of five years for possession of 100 grams mixture or 10 grams of pure methamphetamine, and a ten-year minimum for 1 kilogram mixture or 100 grams pure meth. *Anti-Drug Abuse Act of 1988*, 21 U.S.C. 1501 § 6470(g) (1988).

Just two years later, under the Crime Control Act of 1990, Congress amended the guidelines to include the smokable crystal form of meth, "Ice," and chose to punish this form of methamphetamine two levels above other forms. *Crime Control Act of 1990*, 31 U.S.C. 5311 § 2701 (1990).

In 1995, Congress decided to "delete the distinction between...methamphetamine in the Drug Equivalency Tables," and emphasized that the "weak form of methamphetamine...is never made intentionally, but rather results from a botched attempt...." U.S.S.G. § 2D1.1 (amend. No. 518).

In 1996, Congress passed the *Comprehensive Methamphetamine Control Act of 1996*. This Act decreased the requisite quantity for a methamphetamine mixture to 50 grams for five years, and 500 grams for ten years. Congress listed four reasons for the decreased quantities:

> (1) the rapidly growing incidence of methamphetamine abuse and the threat to public safety such abuse poses;
> (2) the high risk of methamphetamine addiction;
> (3) the increased risk of violence associated with methamphetamine trafficking and abuse; and
> (4) the recent increase in the illegal importation of methamphetamine and precursor chemicals.

> See *Comprehensive Methamphetamine Control Act of 1996*, 21 U.S.C. 801 § 301(a).

Further, in 1998, Congress continued to enact harsher penalties on methamphetamine use by passing the *Methamphetamine Trafficking Penalty Enhancement Act of 1998*. This Act cut in half the quantities of pure meth which triggered the mandatory minimums. *Methamphetamine Trafficking Penalty Act of 1998*, 21 U.S.C. 801, div. E, sec. 2.

Then, in 2000, Congress amended the Guidelines to include sentencing level increases for methamphetamine offenses which created a "substantial risk of harm" to minors or incompetents. *Children's Health Act of 2000*, 42 U.S.C. 201 § 3612.

In 2010, Congress passed the *Fair Sentencing Act of 2010*, which added a 2-level enhancement for methamphetamine charges if the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." *Fair Sentencing Act of 2010*, 21 U.S.C. 801, § 6.

Most recently, the *Methamphetamine Response Act of 2021* was introduced and passed in the senate on December 14, 2021. Though it has not yet become law, the purpose of the bill is to "designate methamphetamine as an emerging drug threat" and to direct the Office of National Drug Control Policy to implement a response plan.

Congress has consistently demonstrated that it has sought to increase punishments for the distribution of methamphetamine and show its concern for the threat that methamphetamine poses across the United States. Congress has: (1) decreased quantity amounts that trigger mandatory minimums, (2) increased penalties for the manufacturing and distribution of methamphetamine which harms children,

and (3) has continually emphasized the harms that methamphetamine abuse and addiction poses.

While Congress has decreased punishments for other controlled substances, Congress has never decreased punishments for distribution of methamphetamine but has only increased punishments for distribution of methamphetamine. Because Congress's clear intent has been to punish methamphetamine more severely, the courts should be much more inclined to follow Congress' intent through implementation of the Guidelines and be much less inclined to downward vary from them.

### C. <u>The PSR Correctly Calculated the Base Offense Level</u>

Defense challenges the amount and purity of the methamphetamine Mills sold to law enforcement. (See Doc. 33). His objection should be denied. Both the defendant and the government have an interest in a correctly calculated guideline range. While the defenses objection may seem compelling, the Sentencing Commission has not yet taken this issue up and the guidelines at this time have and make the very distinction he objects to.

While a defendant is given the benefit of applying the least stringent guidelines that were in place during the span of the criminal conduct, and in some instances may even be given the benefit of new guidelines that have been approved but not yet enacted, neither of those circumstances exist here.

In other words, the guidelines are correctly calculated, and the sentence should reflect that. To the extent the defense would like to preserve the objection for future appellate purposes should the guidelines ever change, the record has been made.

### D. This Court should not discard the Sentencing Guidelines as calculated

First, the Court should not discard the Guidelines because, although they were deemed "advisory," the Supreme Court has maintained that they should maintain a "key role" and "starting point" in sentencing.

While the Supreme Court deemed "the Guidelines system advisory," *United States v. Booker*, 543 U.S. 220, 246 (2005), in *Kimbrough v. United States*, the Supreme Court emphasized that there was still a "key role for the sentencing commission." 552 U.S. 85, 89 (2007). The Supreme Court held that the Commission "fills an important institutional role...[i]t has the capacity courts lack to 'base its determinations on empirical data and national experience...." Id. Because of this, "district courts must treat the Guidelines as the 'starting point and the initial benchmark.'" Id. (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).

When district courts are making a sentence determination, the Guidelines are "not the only consideration." *Gall*, 552 U.S. at 39. The judge "should consider all of § 3553(a)'s factors" and "must make an individualized assessment based on the facts presented." *Id.* at 50. This principle strikes a balance between the Sentencing Commission's "important institutional role" and "expertise," and the sentencing judge's "greater familiarity with...the individual case and the individual defendant...." *Kimbrough*, 552 U.S. at 108–09. While this may appear as a seemingly flexible standard, the Supreme Court cautioned that a "significant justification" is required when district courts choose to deviate from the Sentencing Guidelines. Id. (emphasis added). If the district court "decides that an outside-Guidelines sentence is warranted,

9

he must...ensure that the justification is sufficiently compelling to support the degree of variance." *Id.*

In the present case, no such justification exists to depart from the Sentencing Guidelines. This specific case does not fall outside the "heartland to which the Commission intends the individual Guidelines to apply." *Kimbrough*, 552 U.S. at 109.

**E.** **The defendant possessed a firearm, a dangerous weapon, at the time he possessed and sold methamphetamine**

Defense challenges the application of a two-level adjustment to the defendant's base offense level for possession of a firearm. (See Doc. 33). The United States submits that the PSR correctly adds two levels to the defendant's base offense level pursuant to §2D1.1(b)(1) because Mills possessed a firearm while possessing and selling methamphetamine. (See Doc 34 at paragraph 29). The commentary to section (b)(1) further clarifies the application of this enhancement.

> The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. *The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.* For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet. The enhancement also applies to offenses that are referenced to §2D1.1; see §§2D1.2(a)(1) and (2), 2D1.5(a)(1), 2D1.6, 2D1.7(b)(1), 2D1.8, 2D1.11(c)(1), and 2D1.12(c)(1).

> See USSG §2D1.1(b)(1) *emphasis added*

This was clearly the case here. Mills admitted in the factual basis that he sold the agent approximately 223.3 grams of 96-percent-pure methamphetamine, approximately 2.3 grams of marijuana, *an Arcadia Machine and Tool semi-automatic*

*pistol, and six rounds of .22-caliber ammunition.* He cannot now claim that his sale of the pistol and the ammunition was somehow so attenuated to the point where it should not be counted. Therefore, his objection should be denied.

## CONCLUSION

In considering the Section 3553(a) factors, as individually applied to this defendant, the Court should conclude that the adjusted Sentencing Guidelines provide the proper punishment for the offense of conviction. The government submits that the defendant's objections should be denied and that a guideline sentence of imprisonment is appropriate for this defendant. In addition, the Court should impose a period of Supervised Release as set forth in the PSR. This sentence is sufficient, but not greater than necessary to appropriately addresses the nature of the crime for which the defendant was convicted, his personal characteristics, and his history.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:     /s/ Craig R. Gestring
        Craig R. Gestring
        Assistant United States Attorney
        Florida Bar No. 19106
        400 N. Tampa Street, Suite 3200
        Tampa, Florida 33602-4798
        Telephone:   (813) 274-6000
        Facsimile:    (813) 274-6358
        E-mail: craig.gestring@usdoj.gov

**U.S. v. Timothy Mills, II**                    **Case No. 8:21-cr-0294-MSS-AAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2022, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Jason Reid, Esq.

/s/ Craig R. Gestring
Craig R. Gestring
Assistant United States Attorney
Florida Bar No. 19106
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: craig.gestring@usdoj.gov