**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNTIED STATES OF AMERICA,
    Plaintiff,

v.                                            CASE NO.: 8:21-cr-294-MSS-AAS

TIMOTHY MILLS,
    Defendant.
_____/

**SENTENCING MEMORANDUM, OBJECTIONS, MOTION FOR DOWNWARD DEPARTURE AND MOTION FOR DOWNWARD VARIANCE**

**COMES NOW** the Defendant, TIMOTHY MILLS, by and through undersigned counsel, and respectfully submits to this Honorable Court this Sentencing Memorandum, Objections, Motion for Downward Departure and Motion for Downward Variance.

**Procedural History**

On August 30, 2021, undersigned counsel was appointed for pre-indictment representation of the Defendant in 8:21-mj-1877. The Government provided initial discovery, which undersigned counsel reviewed with the Defendant. A Plea Agreement, Waiver of Indictment and Information were filed on September 8, 2021. (Doc 1, 7 & 8). The Defendant was charged and entered a plea of guilty to two counts. Count 1 charges a Conspiracy to Distribute 50 grams or more of methamphetamine, 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii). Count 2 charges Possession of a Firearm and Ammunition by a Prohibited Person, 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

The Defendant has been in the custody at various incarceration facilities since January 29, 2021. He was sentenced to 6 years in the Florida Department of Corrections for charges stemming from his January 29, 2021, arrest.

First Appearance and the Plea Hearing were held on May 24, 2022, and acceptance of the plea was recommended. (Doc. 29). This Honorable Court signed the order accepting the plea of guilty to Counts 1 and 2 in the Information on June 13, 2022. (Doc. 31).

## Plea Agreement

The Government will recommend to the Court that the Defendant be sentenced within the applicable range in the Sentencing Guidelines pursuant to Fed. R. Crim. P. 11(c)(1)(B). (Doc. 8, ¶ 8). If no adverse information has been received by the Government, the Government will not oppose two downward adjustments. First, the Defendant will request a two level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). (Doc. 8, ¶ 9). Second, since the original level of the offense greater than level 16, the Defendant will request a one level downward adjustment, as a result of the Defendant timely notifying the Government of an intent to plea pursuant to U.S.S.G. § 3E1.1. (Doc. 8, ¶ 9).

## Personal History and Future Goals

The Defendant will stipulate to the personal history and Family Data portion of the Presentence Investigation Report (PSR) in paragraphs 56-67, and 69-92. However, the Defendant objects to paragraph 68 of the PSR, as the defendant is unaware of any gang known as "Irish Pride," therefor, he is not a member of any gang named "Irish Pride". The defendant does have a tattoo that reads Irish Pride, but that tattoo is in regards to the defendant's ethnic heritage, his father's side of the family is Irish. Also, the defendant is working on getting some of his tattoos removed.

The Defendant, through counsel would express his sincere remorse. The Defendant's goal is to become a productive citizen. While incarcerated in the United States Bureau of Prisons, the Defendant respectfully requests the following: that he be allowed to work to earn money through the UNICOR program, if eligible; that he be allowed to participate in vocational training in the fields of culinary arts and air conditioning repair and maintenance; that he be considered for the 500 Hour Residential Drug Abuse Program, if eligible, and any appropriate substance abuse treatment and counseling program. The Defendant would like to be housed in the Bureau of Prisons within a reasonable distance from Jacksonville, if possible, for example; FCI Jessup, FCI Coleman, and FCI Marianna.

## **SENTENCING**

The Presentence Report (PSR) was completed by USPO Jennifer Fogg and was filed on July 29, 2022. (Doc. 34). One of the individuals listed in paragraph 19 as S.M., is listed in the related cases section of the PSR with his full name, Steven McWhorter.

In paragraph 20, it appears that the 838 grams may have been reached as a result of adding the amounts in paragraph 19 and then subtracting by the amount obtained on the three dates of transaction discussed in the offense characteristic portion of the PSR. It appears that this remainder amount of 838 grams was possessed by the Defendant over the course of two years. A portion of this amount was used by the Defendant personally as stated in paragraph 82.

The defense would posit, based upon a review of the discovery received, which includes audio-video recordings, that the Defendant was a middleman between the individuals listed in paragraph 19 and the undercover agent and confidential informant. In the first group of recordings made on July 22, 2020, the undercover agent and confidential informant pick up the Defendant to meet another individual (Seller) for the purchase of 4 ounces of methamphetamine.

During the drive, the undercover agent states that he sells firearms and initiates a discussion with the Defendant in an attempt to "sell" the Defendant some firearms. The three of them drive to several locations as the Defendant is speaking to the Seller on the phone, as the Seller that keeps changing the location of the meet. Once they arrive, the Defendant can be seen going back and forth between the undercover agent and confidential informant and the Seller several times. The transaction almost fails because of a disagreement between the undercover agent and the Seller. It is apparent from the second recording that the Seller threw the methamphetamine on the hood of a vehicle out of frustration at the first transaction.

The second transaction on August 5, 2020, is also recorded with audio-visual technology. It appears that the Defendant is with another individual (Seller), and by the discussion, appears to be the middleman again between undercover agent and confidential informant and the Seller. It appears the Seller is a different person than the first transaction. At the end of this transaction when the undercover agent and confidential informant are discussing the defendant, the confidential informant describes the defendant as "dumb."

The final transaction on September 16, 2020, is also recorded with audio-visual technology, however, the recording is of poor quality and little can be garnered from the review.

## **OBJECTIONS AND MOTIONS FOR DOWNWARD DEPARTURE AND VARIANCE**

### **Methamphetamine quantity and purity**

Commentary of the Sentencing Guidelines states that for PCP, amphetamine, methamphetamine, hydrocodone and oxycodone, the Guidelines take into account the purity of the substance so the Court need not consider an upward departure for purity as it would with other substances. U.S.S.G. § 2D1.1, cmt. n.27(C). The Commentary continues, in regards to heroin, that the purity "may be relevant in the sentencing process because it is probative of the

defendant's role or position in the chain of distribution." *Id.* The Commentary continues with the proposition that high purity "is particularly relevant where small quantities are involved," but gives neither a factual basis for this proposition nor a definition of "small quantities". *Id.* Methamphetamine that is between 80-100% is given a converted drug weight that is 10 times that of Methamphetamine that is 79% pure or less. U.S.S.G. § 2D1.1, cmt. n.8(D).

The 7th Circuit has held that in a conspiracy with evidence that the conspirators referred to their commodity as "ice" was insufficient to meet the Governments burden of proving the substance fit the definition of U.S.S.G. § 2D1.1 n.C. *U.S. v. Carnell*, 972 F.3d 932, 936 (7th Cir. 2020). The 7th Circuit discussed law enforcement testimony that the substance appeared to be similar to "ice" and that none of the conspirators ever talked about cutting the substance. *Id.* at 936. It went on to discuss statements about the quality of the substances by the conspirators. *Id.* at 936-7. The 7th Circuit then discussed two lab reports produced by the Federal Drug Enforcement Agency. The 7th Circuit stated that "[t]he government had an incentive to line Carnell's untested ice to the lab-tested ice." *Id.* at 937. The first lab report was conducted on a substance obtained from a co-defendant that tested 100% pure and another co-defendant testified that the substance obtained from Carnell and this co-defendant were of same quality. *Id.* at 937. The second lab report was conducted on a substance obtained from co-conspirator, but was not charged as a co-defendant, when the co-conspirator was arrested with Carnell present. The second substance also tested 100% pure. *Id.* at 937-8. The Government's burden at sentencing was to show "that a preponderance of reliable evidence supports the drug quantity finding." *Id.* at 938 (citing *U.S. v. Tankson*, 836 F.3d 873, 881 (7th Cir. 2016). The 7th Circuit rejected the 8th Circuit's approach of allowing testimony to distinguish "ice' from methamphetamine that is 79 % pure or less because it was nonsensical to think a person can distinguish between 79% and

80% pure methamphetamine. *Id.* at 941. The court held that the evidence described above was insufficient to meet the Government's burden. *Id.* The 4th Circuit joined the 7th Circuit in its view of the Government's burden in proving the 80% purity of methamphetamine in sentencing. *U.S. v. Williams*, 19 F.4th 374, 380 (4th Cir. 2021).

In *U.S. v. Ibarra-Sandoval*, the Court sentenced the defendant with an ice Guideline range of 63-78 months, within a Guideline range for methamphetamine that is 79% pure or less, 46-57 months, noting the Defendant was a courier. 265 F.Supp. 3d 1249 (D.N.M. 2017). The Court went on in great detail to discuss the basis for its downward variance other than the fact that the defendant was a courier. The Court noted that the Supreme Court emphasized that permissible variations can be based on policy considerations or disagreements with the Guidelines, and that deviations from the Guideline need not be based on a particular defendant's individual circumstances but can be based on a simple disagreement with the Guidelines. *Id.* at 1251-2 (citing *Spears v. U.S.*, 555 U.S. 261 (2009)). The Court went on to discuss the empirical process in which the Guidelines were created, then noted that this empirical process was not followed when setting the Guidelines range for drug offenses. *Id.* at 1253 (citing *Gall v. U.S.*, 552 U.S. 38, 46 n.2). The Court then discusses the tragic death of Len Bias on June 19, 1986, and that Congress hastily enacted the Anti-Drug Abuse Act of 1986 (ADA). *Id.* at 1253. The Court then quotes Senate Minority Leader Robert Byrd for a statement he made during the debate that lead to the ADA that the 10 year minimum mandatory was "for the kingpins". *Id.* at 1253. The Court stated that the Sentencing Commission did not use its typical empirical approach when it created the Guidelines for drug offenses and therefor "are not a reflection of the Commission's institutional strengths" so district courts have more discretion to vary from the Guidelines for drug offenses. *Id.* at 1253-4 (citing *Kimbrough v. U.S.*, 552 U.S. 85 (2007) for its discussion

about the Guidelines in regards crack cocaine and the Government's argument that the Guidelines are an expression of Congressional policy). The Court concluded its analysis by stating that "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." *Id.* at 1256.

In *U.S. v. Nawanna*, the Court discusses its reasoning in reducing the Guidelines sentencing range by one third, on the basis of a policy disagreement. 321 F.Supp. 3d 943 (N.D. Iowa 2018) (citing a prior case in which the Court had done a similar reduction for sentencing on a methamphetamine offense, *U.S. v. Hayes*, 948 F.Supp.2d 1009 (N.D. Iowa 2013)). The Court described the Offense Conduct statement of the PSR and stated that on the day of the arrest Nawanna had a driver and another individual that was "muscle" that was holding a loaded firearm. *Id.* at 946. The Court then discusses the *2017 National Drug Threat Assessment* 70 (Oct. 2017), in which the DEA discusses the average purity of one gram of modern methamphetamine, which averaged 95.9% purity. *Id.* at 948; at pg. 69. The Court states that it agrees with another judge that due to this average purity, purity is no longer an accurate indicator of culpability or the defendant's role in the drug enterprise. *Id.* at 954 (citing *U.S. v. Hartle*, 4:16-cv-233-BLW, 2017 WL 2608221at 1 (D. Idaho June 15, 2017)). The Court then goes on to state that it does not have to provide a downward variance because of a policy disagreement, but when a Guidelines provision doesn't exemplify the Sentencing Commission's "'institutional role'" and "when the Guidelines range results in sentences greater than necessary to achieve sentencing objectives and … are not based on empirical data and national experience" a downward variance is appropriate. *Id.* at 950 (citing *Spears v. U.S.*, 555 U.S. 261 (2009); *Kimbrough v. U.S.*, 552 U.S. 85, 96 (2007); *Gall v. U.S.*, 552 U.S. 38, 46 n.2 (2007)). The Court continued that in the cases in which it analyzed the 10 to 1 ratio for 80% or purer methamphetamine, the Government had not

produced empirical evidence to support the 10 to 1 ratio and did not challenge the contention that the 10 to 1 ratio was not supported by empirical evidence. *Id.* at 951-1. The Court concluded by sentencing Nawanna to 132 months incarceration citing factors, some of which are mentioned above, that supported a higher sentence and a substantial assistance motion filed pursuant to U.S.S.G. § 5K1.1 that supported a lower sentence. *Id.* at 956-7.

Courts in the Middle District of Florida have addressed the 10 to 1 ratio in the Guidelines for methamphetamine that is 80% or greater purity. In *U.S. v. Carnegie*, the Honorable John Antoon II discusses his analysis that lead to him "to concur with other district courts that have categorically disagreed with the 10:1 ratio…conclud[ing] that the policy is 'divorced from reality," and issue a sentence within the Guidelines for methamphetamine that is 79% pure or less. Case No. 5:20-cr-63-JA-PRL. Judge Antoon notes that a "growing number of other district courts that have carefully considered" and determined that the Guidelines policy for the 10 to 1 ratio is flawed because it is not based on empirical data and does not achieve its stated purpose. *Id.* at 1-2. Judge Antoon finds support for this determination in his case and other cases where the Government did not dispute that the 10 to 1 ratio is not based on empirical data. *Id.* at 3 (citing *U.S. v.* Bean, 371 F. Supp. 3d 46, 51 (D.N.H. 2019); *Gall v. U.S.*, 552 U.S. 38, 46 n.2 (2017)). Judge Antoon goes further and states that the assumption "that methamphetamine purity indicates a defendant's role in a drug trafficking organization is debunked by recent studies." *Id.* at 5. Judge Antoon finds that the "application of the 10:1 ratio 'illogically skews sentences for [common] defendants to the upper end of the sentencing spectrum'." *Id.* at 5-6 (citing *U.S. v. Ortega*, 2010 WL 1994870, pg. 7 (D. Neb. 2010). Judge Antoon found that if the Government does not analyze the methamphetamine in a case, it would invariably lead to unwarranted

sentencing disparities. *Id.* at 6 (citing *U.S. v. Ferguson*, 2018 WL 3682509, pg. 4 (D. Minn. 2018)).

The Middle District of Alabama has analyzed purity and quantity aspects of the Guidelines in a case involving a "defendant essentially serv[ing] as middleman" during the offenses involving methamphetamine. *U.S. v. Johnson*, 379 F. Supp. 3d 1213 (M.D. AL 2019). Honorable Myron Thompson granted the requested downward variance "based on the policy disagreements with the methamphetamine guidelines that this court shares with a growing number of district courts across the country." *Id.* at 1215. Judge Thompson notes that the offender's role is a better indicator of culpability and agrees with a case in which the court placed "'almost no weight' on the Guidelines ranges for the defendant middleman" and determined culpability with factors analyzing role: compensation, proprietary interest in the drugs, length of involvement in trafficking and reason for involvement. *Id.* at 1215, 1218 & 1220 (citing *U.S. v. Diaz*, 2013 WL 322243 (E.D.N.Y. 2013); *U.S. v. Cabrera*, 567 F.Supp. 2d 271 (D. Mass. 2008)). Judge Thompson then cites studies that found that "every function" of a drug conspiracy involves the minimum mandatory quantity of drugs. *Id.* at 1221. Judge Thompson granted the Motion for Downward Variance based on policy disagreements with the Guidelines. *Id.* at 1229-30 (citing on page 1217: *U.S. v. Irey*, 612 F.3d 116 1212 (11th Cir. 2010) (enbanc); *Pepper v. U.S.*, 562 U.S. 476, 501 (2011)).

Judge Thompson discussed in detail various methods courts have used "to calculate the magnitude of the downward variance based on policy agreements with the methamphetamine guidelines." *Id.* At 1228-9. There is the categorical approach, when the court is focused on the Guidelines imprudent emphasis on quantity, of reducing the Guidelines range by a third. *Id.* at 1228. There is a purity policy disagreement approach of calculating the base offense level as if

the amount was a methamphetamine mixture. *Id.* at 1229. Judge Thompson used a hybrid approach and treated the amount as a methamphetamine mixture then reduced the offense level by 2 levels. *Id.* at 1229 (continuing the discussion after this calculation in regards to a safety valve reduction not present in this case). *See U.S. v. Harry*, 313 F.Supp. 3d 969, 972-3 (N.D. Iowa 2018)(providing an example of how the Guidelines disproportionately sentence defendants convicted of methamphetamine versus those convicted of heroin and fentanyl, specifically with ice, noting "more than twice the range of the heroin conspirator", and noting that it is still greater even if the methamphetamine is treated as a mixture).

There are studies that show anaphylaxis has possibly contributed to drug abuse deaths with individuals with unlethal amounts of opioids in their system. (Maurer et al.: *Risk of anaphylaxis in opioid dependent persons: effects of heroin versus substitution substance*. <u>Substance Abuse Treatment, Prevention, and Policy</u> *2014* **9**:12). Allergic reactions are more likely to occur if an individual is introducing a larger number of substances into their body. Therefore, one could posit that narcotics with high purity, and thus with fewer amounts of unknown substances and lower amounts of those unknown substances, can be less deadly in certain situations.

Although the Guidelines are a starting point, a court cannot presume that the Guidelines range is reasonable and must independently consider the sentencing factors in 18 U.S.C. § 3553(a). *Gall v. U.S.*, 552 U.S 38 (2007). The one requirement that a district court must adhere to when imposing a sentence is that the sentence must be reasonable. *Id.* at 51.

The Defendant's actions to which he plead were caught on surveillance video. The first two transactions are able to be observed with some clarity. In the first, it is apparent that the Defendant is acting as a "middle man" between a narcotic supplier and the undercover agent and

confidential informant. The transaction takes place in a parking lot and the Defendant walks back and forth between the narcotic supplier and the undercover agent and confidential informant. Also, in the first transaction, during a lengthy conversation with the undercover agent and confidential informant driving the defendant to numerous locations in an effort to meet the narcotic supplier, the Defendant describes his narcotics sales, which can be characterized as "street level", and that he, the defendant, did not have a lot of money and had to rent space in other people's residence. The second transaction is viewable, and it appears that once again, the Defendant is the go between for a Seller and the undercover agent and confidential informant.

### **Firearm Enhancement**

U.S.S.G. § 2D1.1(b)(1) "provides an enhancement for a person convicted of certain drug-trafficking offenses if a firearm was possessed during the offense." *Bailey v. U.S.*, 516 U.S. 137 (1995). The standards required for the firearm enhancement under U.S.S.G. § 2D1.1(b)(1) is similar to the standards for precluding safety valve relief because of possession of a firearm under U.S.S.G. § 5C1.2(a)(2), but there is "daylight between" them. *U.S. v. Carrasquillo*, 4 F. 4th 1265 (11th Cir. 2021) (finding that the factual findings made by the district court in its U.S.S.G. § 2D1.1(b)(1) analysis would preclude safety valve relief under U.S.S.G. § 5C1.2(a)(2)). The difference between the standards seems to be that the initial burden is on the Government in analyses of U.S.S.G. § 2D1.1(b)(1) and on the defendant in analyses of U.S.S.G. § 5C1.2(a)(2). *Id.* at 1272.

The Government's burden in U.S.S.G. § 2D1.1(b)(1) analysis is to show by a preponderance of evidence "that the firearm was present at the site of the charged conduct or prove that the defendant possessed a firearm during conduct associated with the offense of conviction." *U.S. v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). Proximity between the guns

and drugs is sufficient. *U.S. v. Carillo-Ayala*, 713 F.3d 82, 91 (11th Cir. 2013). The Government must show some nexus beyond mere possession between firearms and the drug crime. *U.S. v. Timmons*, 283 F.3d 1246. The Government must show the firearm had some "purpose or effect with respect to the drug trafficking crime" and that an accident or coincidence is not enough. *Id.* at 1251. Relevant conduct is acts that were part of the same course of conduct or common scheme or plan as the [trafficking in methamphetamine]."

Once the Government meets its burden in analyses of U.S.S.G. § 2D1.1(b)(1), a defendant can then show it is "clearly improbable" that the gun is connected with the drug offense to avoid the (b)(1) enhancement. *U.S. v. Carrasquillo*, 4 F.4th 1265 (11th Cir. 2021); *U.S. v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006); and U.S.S.G. § 2D1.1 n.2.

The 11th Circuit has determined that the Government has not met its burden in several cases. The government failed to meet the burden in a situation in which a co-conspirator was arrested at his home that was shared with 3 others, where no drug paraphernalia was found, and there was no evidence the firearms were unlawful. *U.S. v. Stallings*, 463 F.3d 1218 (11th Cir. 2006). In *U.S. v. Black*, the 11th Circuit found error in applying the enhancement as "there was no evidence that Black possessed the firearm during any of the methamphetamine transactions" and that the sale of the firearm took place five days after the sale of the methamphetamine. No. 17-14708 (unpublished) (11th Cir. Sept. 28, 2018). In *U.S. v. Roland*, the 11th Cir. reversed the firearm enhancement where over 18 firearms were located at a pain management clinic in which Roland worked and resided, the Court found that only the writing of illegal prescriptions took place at the clinic-residence. No. 17-11058 (unpublished) (11th Cir. June 14, 2018). The 11th Circuit has addressed the question of "whether a drug dealer who also sells firearms to a drug customer possesses those firearms 'in connection with' the charged drug offense" and answered

"'not necessarily'." *U.S. v. Carillo-Ayala*, 713 F.3d 82, 85 (11th Cir. 2013) (affirming the denial of a safety valve sentence because the defendant was not in the narrow class of defendants who are the least culpable). The 11th Circuit has also reversed sentencing enhancement under U.S.S.G. § 2D1.1(b)(1) where it found the Government's evidence as unreliable. *U.S. v. Perez-Alonso*, No. 15-14894 (unpublished) (11th Cir. Mar. 10, 2017) (finding the hearsay evidence of a co-defendant did not have indica of reliability); *See also U.S. v. Turner*, No. 10-11617 (unpublished) (11th Cir. Mar. 14, 2011) (holding that the Government did not meet its burden and remanded the case for the court to analyze if the U.S.S.G. § 2D1.1(b)(1) would apply because of co-defendant's possession of a firearm).

Initially in the first two transactions that are clearly recorded, the undercover agent portrayed as if he was an arms dealer and gave a sales pitch to the Defendant about firearms that he could provide. At no time did the defendant discuss that he had a firearm for sale in the first two transactions. The defense posits, for reasons stated above, that the firearm enhancement should not be applied to the Defendant.

## Sentencing Disparity 3553(a)(6)

One of the factors the Court should look at is the sentence of others involved in the conduct to which the Defendant plead. 18 U.S.C. 3553(a)(6). The other related case, 3:20-cr-153-BJD-MCR, involves one of the individuals, Steven McWhorter, with whom the Defendant obtained methamphetamine. PSR ¶ 19. McWhorter received 136 months of imprisonment. The defense would request that the Defendant receive no more than an individual that is higher up in the supply chain. The defense would also reiterate the arguments that purity does not indicate an individuals proximity to the source. Also, some of the alleged MDMA that was purchased by the

undercover agent did not test for MDMA, showing that the Defendant was deceived by whomever was above him in the supply chain.

## **Minor Role**

The defendant will stipulate that the defendant was not a minimal participant, but would ask the court to depart 2 levels for a minor participant downward departure. U.S.S.G. § 3B1.2(b); *See U.S. v. Cruickshank*, 837 F.3d 1182, 1192 (11th Cir. 2016). The Defendant bears the burden of proving the entitlement to a mitigating role adjustment by a preponderance of evidence. *United States v. De Varon*, 175 F.3d 930, 939 (11th Cir. 1999). "The district court has considerable discretion in making this fact-intensive determination" *U.S. v. Boyd*, 291 F.3d 1274, 2177-78 (11th Cir. 2002). "[T]he application of § 3B1.2 'is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case,' the court should consider:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, n.3(C). A minor participant is one who is less culpable than most other participants in the criminal activity, but whose role was not minimal. *Id.*, n.5.

However, "unless a defendant is 'substantially less culpable than the average participant,' by a preponderance of evidence, the Defendant is ineligible for a mitigating role adjustment. U.S.S.G. § 3B1.2(b)." *Rahmaan v. US*, Civil Case No. 8:18-CV-626-T-27 SPF (M.D. Florida,

Tampa Division March 17, 2020) ( citing *United States v. De Varon,* 175 F.3d 930, 939 (11th Cir. 1999)). The defense would posit that the Defendant is sufficiently less culpable than the average participant in the conspiracy as he was supplied by the three other individuals mentioned in the PSR, and served as a middleman in the three transactions. This shows he was farther from the source of the methamphetamine. The fact that the MDMA was not MDMA, shows the Defendant had lower standing among the individuals in the conspiracy.

WHEREFORE, for the reasons stated above, the Defendant would request that the Court sentence the Defendant to 120 months imprisonment, followed by 60 months of supervised release and waive a fine other than the special assessment.

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of August, 2022, the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the United States Attorney's Office, AUSA Craig Gestring.

THE REID FIRM
**/S/JASON REID**
JASON REID, Esq.
Fla. Bar No. 28307
Attorney for the Defendant
912 7th Ave. E.
Bradenton, FL 34208
941-920-5662
attyjreid@icloud.com
jreid@thereidlawfirm.com